# United States Tax Court

REVIEWED
165 T.C. No. 13

MISSION ORGANIC CENTER, INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket Nos. 6937-23L, 6938-23L.            Filed December 16, 2025.

_____

P is a state-legal marijuana dispensary. R mailed Notices of Intent to Levy to P to collect past due taxes. P requested a collection hearing and made an offer-in-compromise to resolve its liabilities. In calculating the amount of its offer, P reduced its future income by expenses that would not be deductible for tax purposes. R's revenue officer disregarded such expenses when calculating P's reasonable collection potential. R's settlement officer rejected the offer-in-compromise because it was substantially lower than the reasonable collection potential the revenue officer had calculated.

I.R.C. § 280E disallows any deduction or credit of amounts paid or incurred in carrying on any trade or business of trafficking in controlled substances. The Internal Revenue Manual requires expenses that would be disallowed by I.R.C. § 280E to be disregarded when calculating a taxpayer's reasonable collection potential. In rejecting P's offer, R's revenue officer and settlement officer relied on the Internal Revenue Manual.

*Held*: R's settlement officer did not abuse her discretion in relying on the Internal Revenue Manual provisions regarding how to compute P's reasonable collection potential.

**Served 12/16/25**

*Held, further*, R did not abuse his discretion in adopting a policy of disregarding expenses rendered nondeductible by I.R.C. § 280E for purposes of calculating a taxpayer's reasonable collection potential.

BUCH, *J.*, wrote the opinion of the Court, which URDA, *C.J.*, and KERRIGAN, NEGA, PUGH, ASHFORD, COPELAND, JONES, TORO, GREAVES, MARSHALL, WEILER, WAY, ARBEIT, GUIDER, and FUNG, *JJ.*, joined.

COPELAND, *J.*, wrote a concurring opinion, which JONES, GUIDER, and FUNG, *JJ.*, joined.

TORO, *J.*, wrote a concurring opinion, which URDA, *C.J.*, and PUGH, ASHFORD, COPELAND, JONES, GREAVES, GUIDER, and FUNG, *JJ.*, joined.

LANDY, *J.*, wrote a dissenting opinion, which JENKINS and HOLMES, *JJ.*, joined.

JENKINS, *J.*, wrote a dissenting opinion, which LANDY and HOLMES, *JJ.*, joined.

HOLMES, *J.*, wrote a dissenting opinion, which LANDY, *J.*, joined.

————

*Joseph A. Broyles*, for petitioner.

*Nora Demirjian, S. Penina Shadrooz*, and *Yervant P. Hagopian*, for respondent.

OPINION

BUCH, *Judge*: Mission Organic Center, Inc. (Mission), is a state-legal marijuana dispensary based in California that has unpaid income tax liabilities for 2016 through 2020 (years in issue).[1] The Commissioner

_____

[1] Docket No. 9456-23L, involving Mission's 2021 income tax liability, was previously consolidated with these cases. The Court has severed that case from these

initiated collection actions, and Mission made an offer-in-compromise seeking to resolve its unpaid liabilities. The Commissioner evaluated the offer-in-compromise by calculating Mission's reasonable collection potential and comparing it to the amount of Mission's offer. In calculating Mission's reasonable collection potential, the Commissioner did not take into account business expenses that are not deductible as a result of the application of section 280E.[2] The Commissioner rejected Mission's offer and issued Notices of Determination. Mission challenged the Commissioner's determination to reject Mission's offer claiming it was an abuse of discretion to disallow the business expenses that were necessary for the production of Mission's income.

The Commissioner has an established policy to disregard for reasonable collection potential purposes business expenses that are rendered nondeductible by section 280E. The policy is stated in the Commissioner's Internal Revenue Manual (IRM) and is predicated on Congress's enactment of section 280E. Creating this public policy exception is within the authority granted to the Commissioner under section 7122(d) to prescribe guidelines for accepting offers-in-compromise. We resolve the issue in favor of the Commissioner.

*Background*

The parties submitted these cases for decision under Rule 122. Mission is a marijuana dispensary in San Francisco, California, with its principal place of business in California when it filed its Petitions. Established over ten years ago, the business has had gross receipts ranging from around $2 million to over $16 million from 2016 through 2021.

Those gross receipts resulted in significant tax liabilities because section 280E precludes taxpayers from deducting any expense related to a business that consists of trafficking in controlled substances. *See Olive v. Commissioner*, 139 T.C. 19, 29 (2012), *aff'd*, 792 F.3d 1146 (9th Cir.

---

consolidated cases and is remanding it to the Internal Revenue Service (IRS) Office of Appeals (Appeals) for consideration of issues not addressed in this Opinion. See *Mission Organic Center, Inc. v. Commissioner*, T.C. Memo. 2025-130, filed this date.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

2015). Because of that provision, Mission could not deduct for federal income tax purposes its expenses related to its trafficking of marijuana.

Mission has unpaid income tax liabilities for the years in issue. The Commissioner issued two Notices of Intent to Levy to Mission, one dated September 9, 2021, for 2016 through 2019, and the other dated May 9, 2022, for 2019 through 2020.[3] Mission timely submitted two Forms 12153, Request for a Collection Due Process or Equivalent Hearing, for 2016 through 2020. On the Forms 12153, Mission requested collection alternatives by selecting "Installment Agreement" and "Offer in Compromise" for 2016 through 2019 and "Offer in Compromise" and "Cannot Pay Balance" for 2020. Mission did not challenge the amounts of its liabilities on either form.

Mission submitted an offer-in-compromise to resolve its unpaid tax liabilities. The offer included Form 656, Offer in Compromise, and Form 433–B (OIC), Collection Information Statement for Businesses, which was accompanied by tax returns, bank statements, Mission's 2021 profit and loss statement, and other financial information. On its Form 656, Mission marked "Doubt as to Collectibility" as the reason for the offer. On its Form 433–B (OIC), Mission listed total business expenses of $1,490,236. Those expenses included inventory purchased, gross wages and salaries, rent, supplies, utilities/telephones, vehicle costs, insurance, current taxes, and other expenses. Mission calculated its minimum offer to be $78,582. However, Mission made a settlement offer of $65,000 in periodic payments to reserve some cash to meet its operating expenses. In the fall of 2022, Mission also submitted its profit and loss statement for January through July of 2022.

The Centralized Offer in Compromise Unit reviewed Mission's offer-in-compromise. Mission's offer-in-compromise was assigned to a revenue officer who evaluated the offer by computing Mission's reasonable collection potential. The Commissioner's IRM in effect at that time defined reasonable collection potential as "the amount that can be collected from all available means." *See* IRM 5.8.4.3(2) (Sept. 24, 2020). The IRM also states that, for doubt as to collectibility offers, "the decision to accept or reject usually rests on whether the amount offered reflects the [reasonable collection potential]." *Id.* The revenue officer

---

[3] Mission also had an employment-tax liability from 2019 that was addressed in the Final Notice of Intent to Levy dated May 9, 2022. Mission has paid that liability, and we previously dismissed so much of the case as relates to the employment tax liability.

used Mission's 2022 profit and loss statement and bank statements to determine Mission's current assets and future income. The revenue officer combined those amounts to determine Mission's reasonable collection potential. The IRM in effect at the time instructed that future income was to be "calculated by taking the projected gross monthly income, less allowable expenses, and multiplying the difference by the number of months applicable to the terms of offer." IRM 5.8.5.25(3) (Sept. 24, 2021). The revenue officer determined the future income amount was $57,821,293. This amount included the gross monthly income of $1,323,951, minus monthly expenses of $812,258, multiplied by 113 months.[4] When calculating Mission's future income, the revenue officer included the income, cost of goods sold, and vehicle expenses as reported on Mission's 2022 profit and loss statement, but he did not allow business expenses "b/c of business 280e cannabis business." The revenue officer added Mission's total future income to its assets of $30,785 to reach a reasonable collection potential of $57,852,078. This amount substantially exceeded Mission's outstanding liability of $5,246,293 and its offer of $65,000.

Because Mission's reasonable collection potential substantially exceeded Mission's outstanding liability, the revenue officer and his supervisor made a preliminary decision to reject Mission's April 2022 offer-in-compromise. They determined that Mission had "the ability to pay [its] liability in full" and that its "special circumstances did not warrant hardship." That preliminary decision was then forwarded to Appeals for consideration in conjunction with Mission's challenge to the Commissioner's collection activity.

Mission had a collection hearing after the preliminary decision to reject its offer-in-compromise. During that hearing, Mission informed the settlement officer that it was aware of the preliminary decision to reject its offer-in-compromise. Mission stated that it did not agree with the Commissioner's policy that operating expenses for a cannabis business should be disallowed for the purpose of calculating reasonable collection potential, and it expressed its intent to challenge the policy in court. Mission did not discuss other collection alternatives during the hearing.

---

[4] At the time the revenue officer computed Mission's reasonable collection potential, he determined there were 113 months left until the expiration of the collection period of limitations for Mission's liabilities. *See* IRM 5.8.5.25(3).

The settlement officer sustained the rejection of the offer-in-compromise.

The Commissioner issued two Notices of Determination sustaining the Notices of Intent to Levy. The two Notices of Determination provided the same explanation for rejecting Mission's offer-in-compromise, concluding that "[t]he revenue officer did not allow all other operating expenses per Section 280e [sic] – you are involved in cannabis business, which is considered an illegal business activity for federal purposes."

Mission filed two Petitions challenging the Commissioner's denial of the offer-in-compromise. Mission argues that the Commissioner abused his discretion by disallowing business expenses when calculating Mission's reasonable collection potential. Mission argues that IRM 5.8.5.25.2 (Sept. 24, 2021), Calculation of Future Income – Cultivation and Sale of Marijuana in Accordance with State Laws, is in conflict with the Code, Treasury regulations, and other IRM provisions. The Commissioner argues that the settlement officer did not abuse her discretion in rejecting the proposed offer-in-compromise and sustaining the proposed collection action. The Commissioner argues that the policy to exclude expenses that are disallowed by section 280E when computing reasonable collection potential is consistent with the congressional intent underlying section 280E and is consistent with the discretion granted by Congress to set guidelines for offers-in-compromise.

*Discussion*

I.   *Standard of Review*

Where the underlying liability is properly at issue in a collection case, we review the issue of underlying liability de novo. *Sego v. Commissioner*, 114 T.C. 604, 610 (2000). Where the underlying liability is not properly at issue, we review the Commissioner's collection determinations for abuse of discretion. *Id.* An abuse of discretion occurs if the Commissioner adopts "an erroneous view of the law or a clearly erroneous assessment of the facts." *Fargo v. Commissioner*, 447 F.3d 706, 709 (9th Cir. 2006) (quoting *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997)), *aff'g* T.C. Memo. 2004-13. We apply this standard only to the rationale the agency used in its Notice of Determination. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Antioco v. Commissioner*, T.C. Memo. 2013-35, at *25 ("Applying *Chenery* in the

CDP context means that we can't uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer."). If we find an abuse of discretion, we may remand a collection case to Appeals if we determine that a further hearing would be "necessary or productive." *Phillips v. Commissioner*, T.C. Memo. 2022-58, at *7 (quoting *Lunsford v. Commissioner*, 117 T.C. 183, 189 (2001)). But we do not need to remand where it is evident that the conclusion would remain the same, because to do so "would be an idle and useless formality." *Gutierrez-Zavala v. Garland*, 32 F.4th 806, 810 (9th Cir. 2022) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *see Wyman-Gordon Co.*, 394 U.S. at 766 n.6 ("*Chenery* does not require that we convert judicial review of agency action into a ping-pong game.").

## II. *Scope of Review*

Our review is confined to the administrative record. Absent an agreement to the contrary, our decisions in these cases are appealable to the U.S. Court of Appeals for the Ninth Circuit. *See* I.R.C. § 7482(b)(1)(G)(ii), (2). The Ninth Circuit has held that the scope of review in a collection case is confined to the administrative record unless the underlying liability is at issue. *See Keller v. Commissioner*, 568 F.3d 710, 718 (9th Cir. 2009), *aff'g in part* T.C. Memo. 2006-166, *and aff'g in part, vacating in part* decisions in related cases.

## III. *Collection Alternative: Offer-in-Compromise*

Section 7122(a) authorizes the Secretary to compromise any civil or criminal case arising under the internal revenue laws. Section 7122(d) authorizes the Secretary to prescribe guidelines for the officers and employees of the IRS to determine whether an offer-in-compromise is adequate. Regulations implementing section 7122 set forth three grounds for the compromise of a liability: (1) doubt as to liability, (2) doubt as to collectibility, and (3) the promotion of effective tax administration. Treas. Reg. § 301.7122-1(b).

The Commissioner may compromise a tax liability on the basis of doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the tax liability. *See id.* subpara. (2). However, the Commissioner may reject an offer-in-compromise when the taxpayer's reasonable collection potential exceeds the offer. *See Johnson v. Commissioner*, 136 T.C. 475, 486 (2011), *aff'd*, 502 F. App'x 1 (D.C. Cir. 2013). Under the Commissioner's administrative procedures, an

offer-in-compromise based on doubt as to collectibility is acceptable only if it reflects the taxpayer's reasonable collection potential. *Id.* at 485. And the Commissioner will reject any offer that is substantially below the taxpayer's reasonable collection potential unless special circumstances justify acceptance of such an offer. *See id.* at 486 (citing Rev. Proc. 2003-71, § 4.02(2), 2003-2 C.B. 517, 517). The parties dispute Mission's reasonable collection potential.

Section 7122(d)(1) gives the Commissioner wide discretion to accept offers-in-compromise and to prescribe guidelines "to determine whether an offer-in-compromise is adequate and should be accepted." In reviewing a settlement officer's determination, we do not decide for ourselves what would be an acceptable collection alternative. *See Thompson v. Commissioner*, 140 T.C. 173, 179 (2013); *Murphy v. Commissioner*, 125 T.C. 301, 320 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006). Our review is limited to determining whether the settlement officer abused his or her discretion. *See Thompson*, 140 T.C. at 179; *Murphy*, 125 T.C. at 320. When evaluating whether there was an abuse of discretion, among other things, we look to whether the settlement officer complied with applicable procedures. *See Eichler v. Commissioner*, 143 T.C. 30, 39 (2014). And many of those procedures are found in the IRM. *See Kosmides v. Commissioner*, T.C. Memo. 2023-138, at *8.

Indeed, we have at times found that the Commissioner abused his discretion for *not* following the IRM. For example, in *Fairlamb v. Commissioner*, T.C. Memo. 2010-22, 2010 WL 391333, at *7, we found that rejecting an offer-in-compromise that was in the amount of the reasonable collection potential did not have a sound basis in law or fact when the rejection was based on a misapplication of the IRM. Likewise, in *Gurule v. Commissioner*, T.C. Memo. 2015-61, we remanded a collection case for further consideration because the record failed to establish that the Commissioner considered special circumstances known to be present in that case. Remand was warranted because the IRM required consideration of such special circumstances.

IV.   *Review of Appeals' Determination*

The Commissioner's two Notices of Determination provided the same reason for rejecting the offer-in-compromise. The notices stated: "The revenue officer did not allow all other operating expenses per Section 280e [sic] – you are involved in cannabis business, which is considered an illegal business activity for federal purposes."

Section 280E provides that no deduction is allowed for amounts paid in carrying on any trade or business if such business consists of trafficking in controlled substances which is prohibited by state or federal law. I.R.C. § 280E. Federal law characterizes marijuana as a Schedule I controlled substance. *See* Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, § 202(c), 84 Stat. 1236, 1249 (codified as amended at 21 U.S.C. § 812(c) (2012)); *Olive*, 139 T.C. at 21. Although the dispensing of medical marijuana is legal under California law, it remained illegal under federal law during the years the underlying liabilities arose, when the offer-in-compromise was made, and when the offer-in-compromise was evaluated. *See Olive*, 139 T.C. at 39. Even if the trafficking business is legal under state law, being illegal under federal law results in the application of section 280E. *Olive*, 139 T.C. at 39.

The question presented here is the extent to which section 280E may be taken into account in the computation of a taxpayer's reasonable collection potential. There are two plausible readings of the Commissioner's reliance on section 280E. We address both.

One plausible reading is that the revenue officer and the reviewing settlement officer rejected the offer-in-compromise because they thought section 280E required the disallowance of business expenses in a marijuana business when calculating the reasonable collection potential. But section 280E addresses deductions and credits, not the computation of reasonable collection potential. It is found in subtitle A, which relates to income tax, subchapter B, which relates to the computation of taxable income, and part IX, which identifies items that are not deductible. Of course, the location or grouping of Code sections is not to be given legal effect. *See* I.R.C. § 7806(b). But the text of section 261, the first Code section in part IX, makes clear that the provisions in that part relate to computing taxable income, providing: "*In computing taxable income* no deduction shall in any case be allowed in respect of the items specified in this part." (Emphasis added.) And the text of section 280E makes clear that it applies to deductions and credits, providing: "*No deduction or credit shall be allowed* for any amount paid or incurred during the taxable year in carrying on any trade or business . . . of trafficking in controlled substances . . . ." (Emphasis added.) Simply stated, section 280E disallows deductions or credits for any amount paid or incurred in carrying on the trade or business of trafficking in controlled substances; it does not address what expenses may or may not be considered for the purpose of calculating a taxpayer's reasonable collection potential. Accordingly, rejecting the offer-in-

compromise solely on the basis of an understanding that section 280E required that result would have been an error.

The other plausible reading is that the revenue officer and the reviewing settlement officer disallowed such expenses as a policy matter, relying on section 280E as the foundation for establishing that policy and the IRM as the articulation of that policy. A settlement officer ordinarily does not abuse her discretion when she adheres to collection guidelines published in the IRM. *Kosmides*, T.C. Memo. 2023-138, at \*8 (citing *Eichler*, 143 T.C. at 39). We can consider, however, whether the policy itself is an abuse of discretion. *See, e.g., Cunningham v. Commissioner*, T.C. Memo. 2014-200, at \*15 (holding that the Commissioner's policy of not entering into offers-in-compromise or installment agreements with taxpayers who are not up to date in filing required tax returns is not an abuse of discretion).

The IRM directly addresses the reasonable collection potential of businesses engaged in the trafficking of controlled substances. When calculating reasonable collection potential, the IRM generally focuses on cashflow, not deductibility. *See, e.g.*, IRM 5.8.4.1.1 (Apr. 25, 2025); IRM 5.8.5.2 (Apr. 8, 2024). For example, the IRM instructs that reasonable collection potential is to be computed by combining a taxpayer's assets, future income, amounts collectible from third parties, and income or assets that are available to the taxpayer but are beyond the reach of the government. IRM 5.8.4.3.1 (Apr. 30, 2015). Items such as amounts collectible from third parties might not be included in income, but they result in cashflow, and the Commissioner has included them in the reasonable collection potential calculation. The Commissioner, however, has determined not to allow business expenses for marijuana businesses in this calculation on public policy grounds. When calculating the future income of a marijuana business, the IRM states:

> 5.8.5.25.2 (09-24-2021)
>
> Calculation of Future Income – Cultivation and Sale of Marijuana in Accordance with State Laws
>
> (1)    The value of future income used in the determination of an acceptable offer amount is calculated in a different manner when a taxpayer is involved in the cultivation and sale of marijuana, in accordance with applicable state laws. The method

of calculating future income will be based on the following guidance:

a.   Determine the taxpayer's gross income over a specific time period (normally annually);

b.   *Limit allowable expenses consistent with Internal Revenue Code 280E*, where a taxpayer may not deduct any amount for a trade or business where the trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances . . . .

(Emphasis added.) When calculating the reasonable collection potential for businesses trafficking in controlled substances, the IRM instructs that expenses are to be disallowed consistent with section 280E. IRM 5.8.5.25.2(1)(b), (2). Accordingly, the settlement officer's rejection of Mission's offer-in-compromise was consistent with the procedures adopted by the Commissioner and set forth in the IRM. The settlement officer did not abuse her discretion in relying on those procedures.

To the extent Mission is challenging whether the Commissioner's adoption of those procedures is an abuse of discretion, it is not an abuse of discretion in the light of congressional action.[5] The Commissioner expressly identifies his method of computing reasonable collection potential for businesses engaged in the trafficking of controlled substances as a matter of public policy. *See* IRM 5.8.5.25.2(3) ("If the taxpayer is unwilling to increase their offer to the value of the equity in assets plus a future income component calculated based on this subsection, the offer will be rejected under public policy."). The Commissioner does not identify this policy as being required by section 280E, but as being "consistent with Internal Revenue Code 280E." *See*

---

[5] Citing Treasury Regulation § 301.7122-1, Judges Jenkins and Holmes suggest that the IRM is in irreconcilable conflict with the Commissioner's own regulations. *See* Jenkins dissenting op. note 5 and accompanying text; Holmes dissenting op. p. 47. But the regulations provide that the decision to compromise a liability is discretionary. *See* Treas. Reg. § 301.7122-1(a)(1) (providing that "the Secretary may, at the Secretary's discretion, compromise" a liability). And the portion of the regulation that provides special rules for evaluating offers in compromise based on doubt as to collectibility focuses on basic living expenses. *Id.* para. (c)(2)(i). It is silent as to calculating ability to pay for a business, and nothing in the regulations precludes the Commissioner from setting forth how to make those calculations in the IRM. *See* Toro concurring op. pp. 18–19.

IRM 5.8.5.25.2(1)(b). And it is. Section 280E and its legislative history express a congressional intent to disallow deductions attributable to a trade or business of trafficking in controlled substances. *See Californians Helping to Alleviate Med. Probs., Inc. v. Commissioner*, 128 T.C. 173, 182 (2007). By disallowing these same items for purposes of calculating a taxpayer's reasonable collection potential, the Commissioner is adhering to the public policy underlying the enactment of section 280E. In the light of Congress's enacting that provision, it is not an abuse of discretion to disallow such expenses for reasonable collection potential purposes.[6]

In sustaining the collection action in these cases, we remain faithful to *Chenery*. Citing *Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County*, 554 U.S. 527, 545 (2008), Judge Landy suggests that we must remand these cases unless the agency was *required* to take a particular action. *See* Landy dissenting op. pp. 25–26. In that case, the Supreme Court stated: "We will not uphold a discretionary agency decision where the agency has offered a justification in court different from what it provided in its opinion." *Morgan Stanley*, 554 U.S. at 544. But in that same case, the Supreme Court eschewed remand where it "would be an idle and useless formality." *Id.* at 545 (quoting *Wyman-Gordon Co.*, 394 U.S. at 766 n.6). Here, the Commissioner's reliance on the public policy choice as stated in the IRM is not different from what is stated in the Notice of Determination; it is an explanation of the reference to section 280E appearing in the Notice of Determination. But even if the section 280E reference in the Notice of Determination was not a veiled reference to the Commissioner's adoption of this public policy rationale and was instead based on an erroneous understanding that section 280E mandated the rejection of the offer-in-compromise, we do not remand where the result on remand would be a fait accompli. *Chenery* does not require remand merely to make the policy reference explicit. *See Wyman-Gordon Co.*, 394 U.S. at 766 n.6.

The Commissioner had the authority to create guidelines to accept offers-in-compromise pursuant to section 7122(d) and did so.[7] The

---

[6] We express no view on whether the Commissioner could create a similar public policy rationale absent a congressional enactment such as 280E.

[7] Judge Holmes questions the distinction the Commissioner has drawn between how reasonable collection potential is calculated for offers-in-compromise versus how it is calculated for installment agreements. *See* Holmes dissenting op.

revenue officer and the reviewing settlement officer did not abuse their discretion in relying on those procedures to calculate reasonable collection potential and reject Mission's offer-in-compromise.

*Conclusion*

The settlement officer did not abuse her discretion in rejecting Mission's offer-in-compromise. Disallowing business expenses in calculating Mission's reasonable collection potential was consistent with the Commissioner's internal procedures as set forth in the IRM. And the adoption of the policy to disallow such expenses was within the Commissioner's discretion to adopt guidelines to accept offers-in-compromise pursuant to section 7122(d)(1).

To reflect the foregoing,

*Decisions will be entered for respondent.*

Reviewed by the Court.

URDA, *C.J.*, and KERRIGAN, NEGA, PUGH, ASHFORD, COPELAND, JONES, TORO, GREAVES, MARSHALL, WEILER, WAY, ARBEIT, GUIDER, and FUNG, *JJ.*, agree with this opinion of the Court.

LANDY, JENKINS, and HOLMES, *JJ.*, dissent.

---

pp. 43–44. As the Commissioner observes, an installment agreement provides the Commissioner the opportunity to continually monitor compliance and can be terminated for noncompliance. In her concurrence, Judge Copeland highlights why monitoring future compliance over the full life of an installment agreement may justify a distinction. *See* Copeland concurring op. p. 15. But regardless of the justification, the narrow issue we must address in these cases is whether the Commissioner abused his discretion in following his own guidance or in the adoption of that guidance on the facts before us.

14

COPELAND, *J.*, with whom JONES, GUIDER, and FUNG, *JJ.*, join, concurring: I join in the opinion of the Court and write to highlight a point raised by respondent as well as an additional consideration. Respondent noted that petitioner's position circumvents the very purpose of section 280E, and I note that it also violates the spirit of the offer-in-compromise (OIC) regime.

Mission Organic Center, Inc. (Mission), is a marijuana dispensary with a long history of filing its federal income tax returns without paying the resultant tax due. It has tax liens dating back to its 2012 tax year and the cases at issue here involve tax years 2016 through 2021. This is because, under section 280E, it cannot deduct its rent, salaries, utilities, insurance, or other business expenses. (It can subtract its cost of goods sold, but that is the extent of the relief it receives.) Thus, Mission has complied with section 280E in filing its income tax returns not taking those deductions; but in pricing its products and in failing to pay the income tax, Mission has behaved as if section 280E did not exist. It has, in effect, pretended that it can take those forbidden deductions. The record reflects no indication that Mission intends to change its pricing in the coming years and make itself able to pay the actual tax burden of operating a business to which section 280E applies.

As respondent pointed out in the Seriatim Answering Brief filed in these cases, a taxpayer who files an income tax return consistent with section 280E, reports a tax liability, and then files an OIC stating the "actual money" it earned was much less based on doubt as to collectibility, is arguing that it should pay a lesser amount in satisfaction of its tax liability than section 280E mandates. Such a taxpayer would be circumventing the underlying purpose of section 280E. I additionally note that such a taxpayer could likewise just default on the OIC the following year by filing consistent with section 280E, but not paying the amount due—continuing the pattern. Denying an OIC in these circumstances makes perfect sense, and the public policy outlined in the Internal Revenue Manual (IRM) is thus consistent with statutory intent of section 280E and would not wreak havoc on the OIC process.

To be clear, an accepted OIC is a contract whereby the taxpayer agrees to comply with certain terms in exchange for the Internal Revenue Service's (IRS) reducing its tax liability. *Trout v. Commissioner*, 131 T.C. 239, 249 (2008).

In the standard contract that the IRS uses, Form 656, Offer in Compromise, section 7, Offer Terms, clause (*l*) reads as follows:

> As both an express condition and as a contractual promise, I [the taxpayer] will strictly comply with all provisions of the internal revenue laws, including requirements to timely file tax returns and timely pay taxes for the five year period beginning with the date of acceptance of this offer and ending through the fifth year. . . . I also understand that during the five year period I cannot request an installment agreement for unpaid taxes incurred before or after the accepted offer. I understand that I cannot request an offer for a tax liability during the five year period.

The IRS insists that all OICs state this five-year compliance requirement. *See* IRM 5.19.7.14.4 (Dec. 9, 2009). If, after signing the Form 656, the taxpayer fails to fully perform this clause of the contract—for example by not timely paying tax in one of the following five years—then the taxpayer has breached the contract, and the IRS can generally cancel the OIC and demand payment of the taxpayer's original tax liability. *See Trout*, 131 T.C. at 254.

As it relates to the CDP proceeding here, Mission's tax bill has been and will likely continue to be substantially higher than its economic net income. If Mission continues to act in the future as it has in the past, it is difficult to imagine that it will timely pay its tax or keep up with making proper estimated tax deposits. Failure to do so for any of the following five years would result in failure to meet the five-year compliance requirement, were it to be granted an OIC.[1] All else equal, Mission will just be "out of the frying pan, into the fire."

In the OIC context in particular, our Court has been careful not to nullify a statutory scheme by judicial action. *See Speltz v. Commissioner*, 124 T.C. 165, 178 (2005) ("Accepting [the taxpayers'] position would result in nullification of a portion of the statutory scheme by administrative or judicial action. We cannot conclude that section

---

[1] We acknowledge that Appeals did not advance any likely future breach in its reasons for rejecting Mission's OIC and by the *Chenery* doctrine, "we can't uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer," *Antioco v. Commissioner*, T.C. Memo. 2013-35, at \*25; *accord SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), but we fail to see why we would advance a futile effort through remand.

7122 gives the Court a license to make adjustments to complex tax laws on a case-by-case basis."), *aff'd*, 454 F.3d 782 (8th Cir. 2006).

The IRM instructs the offer examiner to reject OICs where the taxpayer has not shown a history of making adequate estimated tax deposits and requires proof of the same. *See* IRM 5.8.7.2.2.2 (Apr. 24, 2025). Given the impact of section 280E on Mission's business model, it is difficult to envision how our remand of these cases for further evaluation of its OIC would result in Mission's proving future compliance. Any relief to Mission would not last beyond the current year. We do not remand a case where doing so would achieve nothing and, as respondent suggests, would advance the violation of a statute. I agree with the reasoning of the opinion of the Court. I further observe the futility of advancing an OIC that violates the spirit of section 280E and is unlikely to observe the OIC's five-year compliance period (where the taxpayer not been in compliance for years because of its refusal to take into account the impact of section 280E).

TORO, *J.*, with whom URDA, *C.J.*, and PUGH, ASHFORD, COPELAND, JONES, GREAVES, GUIDER, and FUNG, *JJ.*, join, concurring:  I join the opinion of the Court in full.  I write separately to explain that the Court's conclusion finds additional support in the Supreme Court's unanimous decision in *INS v. Yueh-Shaio Yang*, 519 U.S. 26 (1996), and to offer a brief response to some of the arguments made by the dissents.

I.    Yueh-Shaio Yang

The analytical approach the Supreme Court followed in *Yueh-Shaio Yang* illustrates how courts evaluate an agency's exercise of discretion Congress has granted the agency.  Although the agency's discretion may be "unfettered at the outset, if it announces and follows— by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed," it must follow that general policy.  *Id.* at 32.  "[A]n irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)."  *Id.*  Yet, when the agency does not "disregard[] its general policy," but "merely take[s] a narrow view" of what is encompassed by the policy, courts do not disturb the agency's choice.  *Id.*[1]

These principles favor the Commissioner here.  To explain why, I first offer some background on the statutory context and facts of *Yueh-Shaio Yang*.  I then apply the lessons of that case to the circumstances now before the Court.

---

[1] To be sure, the standards for judicial review of agency decision-making have evolved in recent years.  *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) (overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) (clarifying and reinforcing the limits of *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)); *Varian Med. Sys., Inc. & Subs. v. Commissioner*, 163 T.C. 76, 105–08 (2024) (reviewed) (discussing the interpretation of statutes and regulations following the *Loper Bright* decision).  Nothing I say here implicates those principles.  Specifically, the recent cases did not involve the circumstances before us, where an agency has essentially exercised its prosecutorial discretion.  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

A.     *Statutory and Factual Context in* Yueh-Shaio Yang

The case addressed the Attorney General's application of a general rule that granted the Attorney General authority to make a discretionary determination.  Title 8 U.S.C. § 1251(a)(1)(H) authorized the Attorney General, at her discretion, to waive the deportation of certain eligible aliens.  By settled practice, the Immigration and Naturalization Service (INS) did not consider an eligible alien's entry fraud when determining whether to waive deportation.

Yueh-Shaio Yang entered the United States unlawfully in 1978, as part of an elaborate and fraudulent scheme that revolved around his divorcing his wife and remarrying her after she assumed a false identity.  After the INS issued an order to show cause why he should not be deported in 1992, he requested a waiver of deportation.  An immigration judge denied the request, and the Board of Immigration Appeals affirmed, considering, among other things, his acts of immigration fraud.

Upon review, the U.S. Court of Appeals for the Ninth Circuit vacated the Board's decision, holding that the Board had abused its discretion by considering some of Yang's fraudulent acts as adverse factors in the waiver analysis.  The Supreme Court reversed the Ninth Circuit's judgment, reasoning that the INS had simply taken a narrow view of its entry fraud exception and that "[t]he 'entry fraud' exception being, under the current statute, a rule of the INS's own invention, the INS is entitled, within reason, to define that exception as it pleases." *Yueh-Shaio Yang*, 519 U.S. at 32.

B.     *Application to Offer-in-Compromise Regime*

As in that case with respect to the waiver of deportation, here the statute gives the Secretary of the Treasury or his delegate wide discretion.  *See* I.R.C. § 7122(a) ("The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense . . . .").  It says he "may" compromise civil cases, not that he must exercise his discretion in any particular way (except for taking into account the "basic living expenses" of taxpayers who are people).  *See* I.R.C. § 7122(d)(2).

As in *Yueh-Shaio Yang* with respect to the concept of "entry fraud," the concept of "ability to pay" at issue here is not present in the statute.  It was introduced by the regulations.  And nothing in the

regulations precludes the Commissioner of Internal Revenue from expounding on it in the Internal Revenue Manual (alternatively, IRM).

Also as in *Yueh-Shaio Yang*, the additional concept we must apply here—"reasonable collection potential"—is not found in the statute or the regulations, but is a creature of administrative practice, namely the Internal Revenue Manual.

So the observations from the Court in *Yueh-Shaio Yang* seem equally applicable here. The Secretary's discretion was "unfettered at the outset," but the Secretary announced "a general policy by which [the Internal Revenue Service (IRS) Independent Office of Appeals' (IRS Appeals)] exercise of discretion will be governed." *See Yueh-Shaio Yang*, 519 U.S. at 32. If IRS Appeals irrationally departed from that policy, that would be arbitrary. *Id.* But IRS Appeals has not "disregarded its general policy here; it has merely taken a narrow view of what constitutes [reasonable collection potential] under that policy." *Id.* Put simply, IRS Appeals did not ignore the Internal Revenue Manual; it faithfully followed it.

At bottom, it seems to me that what Mission does not like is how the Commissioner exercised his discretion when deciding what "ability to pay" and "reasonable collection potential" mean. But, under the Supreme Court's reasoning in *Yueh-Shaio Yang*, that is not a valid objection. As the Court observed:

> The "entry fraud" exception being, under the current statute, a rule of the INS's own invention, the INS is entitled, within reason, to define that exception as it pleases. The Ninth Circuit held that the acts of fraud counted against [Yueh-Shaio Yang] can be described as "inextricably intertwined" with, or an "extension" of, the fraudulent entry itself because they were essential to its ultimate success or concealment. Perhaps so, but it is up to the Attorney General whether she will adopt an "inextricably intertwined" or "essential extension" augmentation of her "entry fraud" exception. It is assuredly rational, and therefore lawful, for her to distinguish aliens such as [Yueh-Shaio Yang] who engage in a pattern of immigration fraud from aliens who commit a single, isolated act of misrepresentation.

*Id.*

Here too the "ability to pay" and "reasonable collection potential" concepts being, "under the current statute," rules of the Secretary's and the Commissioner's "invention," they are "entitled, within reason, to define" those concepts as they please. *See id.* And there is nothing irrational about drawing a line between businesses that engage in what is under federal law a criminal activity and those that do not.

Finally, the Internal Revenue Manual expressly views its special rule for cannabis businesses as a public policy decision. *See* IRM 5.8.5.25.2(3) (Sept. 24, 2021) ("If the taxpayer is unwilling to increase their offer to the value of the equity in assets plus a future income component calculated based on this subsection, *the offer will be rejected under public policy*." (Emphasis added.)). I see no reason under the statute or the regulations why the Commissioner is not entitled to make that public policy judgment and memorialize it in "guidance" such as the Internal Revenue Manual.[2]

II.    *Brief Response to the Dissents*

Judge Jenkins and Judge Holmes maintain that the provisions of the Internal Revenue Manual are inconsistent with the regulations. It is not clear to me how that is so. As it concerns businesses engaged in the cultivation and sale of marijuana in accordance with state laws, the Internal Revenue Manual sets out a more precise process that must be followed before an offer-in-compromise is accepted.

The Internal Revenue Manual provisions constitute the very type of "guidelines" the statute directs the Secretary to "prescribe" "for officers and employees of the Internal Revenue Service to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute." I.R.C. § 7122(d)(1). Nothing in the statute requires such "guidelines" to be adopted by regulation. *Compare* I.R.C.

---

[2] The policy determination reflected in IRM 5.8.5.25.2 is more solicitous of taxpayers involved in the cultivation and sale of marijuana in accordance with state law than to taxpayers involved in other activities criminalized by federal law. *See* IRM 5.8.7.7.2(5) (Apr. 24, 2025) (noting that "rejection based on a public policy decision" may be warranted when "criminal activity is continuing"). Rather than rejecting outright offers-in-compromise from such taxpayers, IRM 5.8.5.25.2 contemplates that such offers can be accepted, so long as the amount of the offer is sufficiently high and respects section 280E. In view of the congressional policy judgments reflected in the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236, and section 280E, the Commissioner has been anything but stingy in the exercise of his discretion as it relates to taxpayers involved in the cultivation and sale of marijuana in accordance with state law.

§ 7122(d)(1) ("The Secretary shall prescribe guidelines . . . ."), *with* I.R.C. § 7122(c)(2)(C) ("The Secretary may issue regulations . . . ."). Congress is assumed to know the difference between guidelines and regulations, especially when the two different terms are used in the very same section of the Code. *See Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018) ("[W]hen Congress includes particular language in one section of a statute but omits it in another[,] . . . this Court presumes that Congress intended a difference in meaning." (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014))); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987))); *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000) ("Different words in a statute . . . should be given different meanings unless the context indicates otherwise."); *Thomas v. Commissioner*, 160 T.C. 371, 382–83 (2023) (reviewed) (same).

Nor is the authority to prescribe guidelines granted to the Secretary under section 7122(d)(1) nondelegable. As section 7701(a)(11)(B) makes plain, a reference in the Code to the "Secretary" "means the Secretary of the Treasury or his delegate."[3] And the term "or his delegate," "when used with reference to the Secretary of the Treasury, means any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context." I.R.C. § 7701(a)(12)(A)(i).

The Secretary of the Treasury has delegated to the Commissioner of Internal Revenue the responsibilities "for the administration and enforcement of the Internal Revenue laws." Treas. Order 150-10 (Apr. 22, 1982), 1982 WL 1004078. The promulgation of the Internal Revenue Manual provisions at issue here falls squarely within that delegated authority. Thus, the dissents' protests notwithstanding, there

---

[3] By contrast, a reference in the Code to the "Secretary of the Treasury" "means the Secretary of the Treasury, personally, and shall not include any delegate of his." I.R.C. § 7701(a)(11)(A).

is nothing untoward with IRS Appeals' following a process set out in the Internal Revenue Manual when deciding what actions to take with respect to an offer-in-compromise from a business entity involved in the marijuana business.

Furthermore, there is no reason to think that the IRS Appeals settlement officer needed to obtain additional approval to reject the offer here. The Internal Revenue Manual is clear: "If the taxpayer is unwilling to increase [its] offer to the value of the equity in assets plus a future income component calculated based on this subsection, the offer will be rejected under public policy." IRM 5.8.5.25.2(3). Mission was "unwilling to increase [its] offer" as contemplated by IRM 5.8.5.25.2, so its offer had to be rejected.

Judge Jenkins discusses IRM 5.8.7.7.2 and suggests that the communications from the Centralized Offer in Compromise (COIC) unit should have included additional language addressing public policy and should have reflected managerial approvals that apply to rejections based on public policy grounds. The contention is misplaced.

To begin, Mission's Opening Brief offers no argument with respect to IRM 5.8.7.7.2. Indeed, the brief does not even cite the provision. Therefore, Mission has forfeited any argument on this point. *See, e.g.*, *Smith v. Commissioner*, 159 T.C. 33, 73 (2022) (collecting authorities), *appeal dismissed*, No. 23-1050, 2024 WL 4394691 (D.C. Cir. Oct. 2, 2024); *see also, e.g.*, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived."). Even in its Reply Brief, Mission cites the provision only in response to an argument by the Commissioner and insists that the Commissioner "based his determination in this case on IRM 5.8.5.25.2, not on IRM § 5.8.7.7.2." Pet'r's Reply Br. 11.

But even if one were to overlook this procedural obstacle, the contention lacks substantive merit. As the relevant letter from the COIC unit explained to Mission, the COIC unit made only "a preliminary decision to reject your offer." Docket No. 6937-23L, Doc. 19, p. 319. The reason for this conclusion was that "[b]ased upon the information you provided, we have determined that you have the ability to pay your liability in full within the time provided by law." *Id.*

The COIC letter further explained:

The decision to reject your offer is a preliminary decision made by Collection personnel. Due to the fact that

you filed a request for a Collection Due Process (CDP) hearing, we are forwarding your case to Appeals. A final determination on the offer will be issued by Appeals in conjunction with your CDP case.

*Id.*

The conclusions in the COIC letter were fully justified in light of the instructions reflected in IRM 5.8.5.25.2. To refresh, that provision specifies how to calculate the future income of a marijuana business. The provision also explains that only "[i]f the taxpayer is unwilling to increase [its] offer to the value of the equity in assets plus a future income component calculated based on this subsection" would the offer be "rejected under public policy."

At the time the COIC unit issued its letter, the COIC unit did not know whether Mission would or would not be willing to increase its offer. Thus, as of that point, there was no reason to include in the letter a rejection on public policy grounds nor to obtain additional managerial approvals from Collections personnel because the requirements of IRM 5.8.7.7.2 (which apply to Collections personnel, not IRS Appeals personnel) were not yet triggered.

Any further discussions about an increased offer would take place with IRS Appeals in the context of Mission's CDP hearing. In short, there is no reason to fault the COIC unit for failing to memorialize unnecessary and premature determinations.

And once the matter was returned to IRS Appeals, Mission's representative made clear he was "aware of the IRS's standing in disallowing the operating expenses for illegal business activities in Offers in Compromise[]. However, he strongly disagrees with that position and would like to take the case to U.S. Tax [C]ourt" for further review. Docket No. 6937-23L, Doc. 19, p. 18. The representative "did not dispute the compliance calculation of the equity in assets [or Mission's] gross income calculation and the cost of goods sold amount." *Id.* Nor did the representative increase the offer.

Mission's position at the CDP hearing in effect tied IRS Appeals' hands. As no increase in the offer amount was forthcoming, "the offer [had to] be rejected under public policy." IRM 5.8.5.25.2. And a rejection is what one sees reflected in the Notice of Determination. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("While we may not supply a reasoned basis for the agency's action that

the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 (1945).").  In these circumstances, the decision made by IRS Appeals was far from an abuse of discretion.

\*       \*       \*

In short, the opinion of the Court's conclusion is wholly consistent with the applicable statutory and regulatory provisions as well as relevant Supreme Court precedent and the dissents' arguments to the contrary are misplaced.  With these additional observations, I join the opinion of the Court.

LANDY, *J.*, with whom JENKINS and HOLMES, *JJ.*, join, dissenting: Holding for the Commissioner in a decision unsupported by the law or the administrative record, the opinion of the Court departs from settled tenets of administrative law and steps into the role of settlement officer. Because the opinion of the Court implicitly and improperly adopts an exception to *Chenery* by offering two plausible readings for the Commissioner's determinations, neither specifically stated in the Notices of Determination (Notices) or supported by the administrative record, I respectfully dissent.

I.     *This Court is bound by the* Chenery *doctrine.*

> "[A] simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. . . ."

> This is not to deprecate, but to vindicate, the administrative process, for the purpose of the rule is to avoid "propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency."

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (alterations in original) (citation omitted) (quoting *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196 (1947)); *accord SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 88 (1943) (holding that "a judicial judgment cannot be made to do service for an administrative judgment" when the "agency alone is authorized to make [such judgment]" and it has not). "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196. "In other words, '[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong.'" *Id.* at 197 (quoting *United States v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 294 U.S. 499, 511 (1935)).

The exception to the *Chenery* doctrine is presented in *Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County*, 554 U.S. 527, 544–45 (2008). At issue in *Morgan Stanley* was the application of a Supreme Court-mandated presumption to a contract dispute before the Federal Energy Regulatory Commission (FERC). *Id.*

at 530. In affirming the U.S. Court of Appeals for the Ninth Circuit and reversing and remanding the FERC's decision, the Supreme Court stated that while it "will not uphold a *discretionary* agency decision where the agency has offered a justification in court different from what it provided in its opinion," *Chenery* does not apply in cases where an agency was *required* to take a particular action. *Id.* at 544–45 (emphasis added) (citing *Chenery I*, 318 U.S. at 94–95). Further, serious doubt as to a different outcome is not enough to sidestep the *Chenery* doctrine. *Arnold v. Morton*, 529 F.2d 1101, 1105 (9th Cir. 1976) ("While we may seriously doubt that the plaintiffs will obtain a [different result], we cannot say that we are certain about this.").

The *Chenery* exception has been applied only in narrow circumstances. *See Calcutt v. FDIC*, 143 S. Ct. 1317, 1321 (2023). Unsurprisingly given the Supreme Court's mandate that the exception be used sparingly, *id.*, this Court has not applied it. Today, the opinion of the Court implicitly excepts itself from *Chenery* but not through the *Morgan Stanley* exception. Instead, the opinion of the Court substitutes its judgment for that of the settlement officer upon a mere belief that the result on remand is "evident" or a "fait accompli." *See* op. Ct. pp. 7, 12. In accepting the Commissioner's public policy rationale raised for the first time on brief, the opinion of the Court adopts this lower standard because the facts do not meet the high bar set by *Morgan Stanley*.

The opinion of the Court's own analysis demonstrates that the *Chenery* doctrine must be applied, and that the Notices do not have the clarity that the *Chenery* doctrine requires. The Notices state that "[t]he revenue officer did not allow all other operating expenses per Section 280e [sic] – you are involved in cannabis business, which is considered an illegal business activity for federal purposes." *See* op. Ct. p. 6. Neither the Notices nor the administrative record set forth the public policy rationale on which Mission's offer-in-compromise (OIC) was rejected. Nevertheless, the opinion of the Court offers two plausible readings of the settlement officer's determinations.

The opinion of the Court's first plausible reading considers reliance on section 280E itself to justify the Commissioner's calculation of Mission's reasonable collection potential (RCP). *See* op. Ct. pp. 9–10. The opinion of the Court appropriately concludes that because section 280E addresses *taxable* income, and not income for purposes of an OIC, "rejecting the [OIC] solely on the basis of an understanding that section

280E required that result *would have been an error.*" *See* op. Ct. pp. 9–10 (emphasis added).

The second plausible reading the opinion of the Court posits is that the Commissioner "disallowed such [business] expenses as a policy matter, relying on section 280E as the foundation" as instructed by the Internal Revenue Manual (IRM). *See* op. Ct. p. 10. According to the opinion of the Court, this is sound reasoning because the Commissioner has the discretion to determine what he will consider in calculating RCP, and his determinations in the Notices are "consistent with section 280E." *See* op. Ct. p. 11. Further, "[t]he Commissioner does not identify this policy *as being required* by section 280E, but as being 'consistent with [it].' . . . And it is." *See* op. Ct. pp. 11–12 (emphasis added). The opinion of the Court is correct: The guidelines to calculate RCP are not "necessary and certain" or mandated by law; they are merely choices over which the Commissioner has discretion. *See Suate-Orellana v. Garland*, 101 F.4th 624, 632 (9th Cir. 2024) (holding that the statute at issue in *Gutierrez-Zavala* was not a jurisdictional bar, and therefore the denial of jurisdiction in *Suate-Orellana* was not a necessary result), *abrogating Gutierrez-Zavala v. Garland*, 32 F.4th 806 (9th Cir. 2022); *see also* op. Ct. p. 11.

Regardless, the opinion of the Court comes to an incorrect conclusion in disregarding *Chenery*. Neither plausible reading offered by the opinion of the Court supports a finding that rejecting Mission's OIC was a necessary result. Even the provision in IRM 5.8.5.25.2(3) (Sept. 24, 2021) instructing rejection does not carry the day for the Commissioner because "it 'is a well-settled principle that the [IRM] . . . is not binding on the [Commissioner].'" *See Palmolive Bldg. Invs., LLC v. Commissioner*, 152 T.C. 75, 85 (2019) (quoting *Thompson v. Commissioner*, 140 T.C. 173, 190 n.16 (2013)). To that end, "the provisions of the [IRM] are *directory rather than mandatory*, are not codified regulations, and clearly do not have the force and effect of law." *See Fargo v. Commissioner*, 447 F.3d 706, 713 (9th Cir. 2006) (quoting *Marks v. Commissioner*, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991) (per curiam), *aff'g* T.C. Memo. 1989-575), *aff'g* T.C. Memo. 2004-13. The opinion of the Court does not explain how a provision in a nonbinding instruction manual dictates a "necessary and certain" result. Consequently, we must apply *Chenery* and look only to the justification provided in the Notices or elsewhere in the administrative record. The opinion of the Court does not do so.

II.     *The opinion of the Court's review is limited to the administrative record.*

In countless opinions, this Court has stated that "[w]e do not substitute our judgment for that of the [settlement officer]." *Loveland v. Commissioner*, 151 T.C. 78, 84 (2018); *accord Johnson v. Commissioner*, 136 T.C. 475, 488 (2011), *aff'd*, 502 F. App'x 1 (D.C. Cir. 2013); *Murphy v. Commissioner*, 125 T.C. 301, 320 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006). Notwithstanding, the opinion of the Court does substitute its judgment for that of the settlement officer. Absent the parties' stipulation to the contrary, *see* § 7482(b)(2), the decision in this case is appealable to the Ninth Circuit, *see* § 7482(b)(1)(G)(ii); op. Ct. p. 7. The opinion of the Court correctly states that when de novo review is not applicable, the scope of review in the Ninth Circuit is confined to the administrative record. *See* op. Ct. p. 7 (citing *Keller v. Commissioner*, 568 F.3d 710, 718 (9th Cir. 2009), *aff'g in part* T.C. Memo. 2006-166, *and aff'g in part, vacating in part* decisions in related cases). There is no dispute that de novo review is not available in this case, and the parties have supplied no reason to believe that the administrative record, as supplemented, is incomplete.

Therefore, this Court's review is limited to deciding whether the IRS's determinations, *as stated in the Notices*, are supported by the administrative record and are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." *See Belair v. Commissioner*, 157 T.C. 10, 17 (2021) (quoting *Van Bemmelen v. Commissioner*, 155 T.C. 64, 78–79 (2020)). "In reviewing for abuse of discretion, we will not supply a reasoned basis for the [settlement officer]'s determinations that the [settlement officer] did not provide . . . ." *See Melasky v. Commissioner,* 151 T.C. 93, 106 (2018) (citing *Chenery II*, 332 U.S. at 196–97), *aff'd*, 803 F. App'x 732 (5th Cir. 2020). This Court can, however, "uphold a [Notice of Determination] of less than ideal clarity if the [IRS's basis for the determination] may be reasonably discerned." *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). We may consider the reasons offered in the Notices and "any 'contemporaneous explanation of the [IRS's] decision' contained in the record." *See Kasper v. Commissioner,* 150 T.C. 8, 25 (2018) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738–40 (D.C. Cir. 2001)).

The administrative record includes the case notes of the revenue officer who made the preliminary determination to reject Mission's OIC. The Notices suggest that the settlement officer relied on those case notes

in rejecting the OIC and sustaining the proposed collection actions. However, those case notes mention neither the public policy rationale upon which the opinion of the Court relies nor any IRM provisions. To the contrary, the notes reflect only that the revenue officer, in calculating Mission's RCP, allowed cost of goods sold and disallowed all other operating expenses "according to Section 280E since Cannabis business." Docket No. 6937-23L, Doc. 19, p. 360.

Indeed, as the opinion of the Court acknowledges, the conclusion that section 280E dictates the exclusion of Mission's operating expenses for purposes of calculating its RCP is not in accordance with the law. *See* op. Ct. pp. 9–10. Given that the opinion of the Court recognizes the possibility that there is no justification in the administrative record beyond "an erroneous understanding that section 280E mandated the rejection of the [OIC]," *see* op. Ct. p. 12, the settlement officer's determinations constitute an abuse of discretion, *see Swanson v. Commissioner*, 121 T.C. 111, 119 (2003) ("If [the Commissioner's] determination [is] based on erroneous views of the law . . . , then we must reject [his] views and find that there was an abuse of discretion.").

Knowing that neither the Notices nor the administrative record provides sufficient grounds to reach the Commissioner's desired result, his counsel offers the public policy rationale for the settlement officer's determinations. *See* op. Ct. p. 6. This Court, however, "may not accept [IRS] counsel's *post hoc* rationalizations for [IRS] action; *Chenery* requires that [the IRS's] discretionary order be upheld, if at all, on the same basis articulated in the order by the [IRS] itself." *Burlington Truck Lines*, 371 U.S. at 168–69. *Chenery* dictates that "we may not supply a reasoned basis for the [IRS's] action that the [IRS] itself has not given," *see Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Chenery II*, 332 U.S. at 196), and *Keller* confines us to the administrative record. The opinion of the Court sustains the settlement officer's rejection of the OIC on a public policy rationale not stated in the Notices or supported by the administrative record, which impermissibly departs from *Chenery* and *Keller*.

III. *The settlement officer abused his discretion and Mission should prevail.*

"If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Rogers v. Commissioner*, 157 T.C. 20, 41 (2021) (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 172

(2021)). Put more simply, if a taxpayer must jump through a series of hoops to qualify for a collection alternative, then the IRS must sufficiently state why the taxpayer's shot misses the mark. The parties submitted this case under Rule 122 and fully stipulated the facts. Accordingly, the settlement officer abused his discretion by rejecting the OIC based on an erroneous view of the law, the proposed collection actions should not be sustained, and Mission should prevail.

JENKINS, *J.*, with whom LANDY and HOLMES, *JJ.*, join, dissenting: The opinion of the Court holds that there was no abuse of discretion in either the rejection of Mission's offer-in-compromise (OIC), given the rules laid out in the Internal Revenue Manual (IRM) concerning the computation of reasonable collection potential (RCP), or the adoption of those IRM rules. I disagree. I also have serious concerns about allowing the Internal Revenue Service (IRS) to override duly promulgated regulations through the IRM, thereby avoiding all of the requirements applicable in the promulgation of regulations. Therefore, I respectfully dissent.

I.     *Statutory and Regulatory Framework*

The opinion of the Court indicates that "[s]ection 7122(d)(1) gives the Commissioner wide discretion" with respect to OICs. *See* op. Ct. p. 8. I agree that section 7122 gives the Secretary of the Treasury and the Secretary of the Treasury's delegates within the Department of the Treasury (Treasury) discretion in determining whether to compromise a liability. *See* § 7122(a). *Compare* § 7701(a)(11)(B) (defining "Secretary"), *and* § 7701(a)(12)(A) (defining "his delegate"), *with* § 7701(a)(13) (defining "Commissioner"). However, it also requires Treasury to prescribe guidelines for the IRS to follow in determining whether OICs are "adequate and should be accepted." *See* § 7122(d)(1). Consistent with the fact that Treasury has a policy interest in how the OIC program is run, Treasury has prescribed overarching rules for the program by following appropriate procedures to promulgate regulations under section 7122. *See* Compromises, 64 Fed. Reg. 39,106, 39,107 (July 21, 1999) (proposing regulations by cross-reference to temporary regulations in T.D. 8829, 64 Fed. Reg. 39,020 (July 21, 1999), 1999-2 C.B. 235[1]); T.D. 9007, 67 Fed. Reg. 48,025, 48,026 (July 23, 2002), 2002-2 C.B. 349, 349 (describing the notice and comment process for the promulgated regulations). *See generally* 5 U.S.C. § 553 (generally requiring notice and comment for rule making). Those regulations contemplate specific guidelines to be developed separately, underscoring the distinction between the broad policy decisions made by Treasury and reflected in the regulations and the more detailed guidance ultimately

---

[1] Interestingly, given the facts of this case, the preamble to those regulations recounts concerns previously expressed by the Acting Secretary of the Treasury about the strictness of the OIC standards applied by the IRS. *See* T.D. 8829, 64 Fed. Reg. at 39,021, 1999-2 C.B. at 235.

left to the IRS. *See* Treas. Reg. § 301.7122-1(c)(2); *see also* T.D. 8829, 64 Fed. Reg. at 39,023, 1999-2 C.B. at 237.

The regulations promulgated by Treasury provide: "*If* the Secretary determines that *there are grounds for compromise under this section*, the Secretary may, at the Secretary's discretion, compromise any . . . liability." Treas. Reg. § 301.7122-1(a)(1) (emphasis added). Thus, the regulations make clear that even if Treasury has determined that an OIC is "adequate," it retains discretion as to whether the OIC "should be accepted." *See* § 7122(d)(1). And, of course, the authority to compromise liabilities, including by exercising the discretion retained by Treasury in the regulations, has been delegated to IRS employees. Treas. Order 150-10 (Apr. 22, 1982); IRM 1.2.2.6.1.2 (June 5, 2018).[2] However, the regulations also make clear that in order for a discretionary determination to be made as to whether to compromise a liability for which there are grounds for compromise, the determination as to whether there are grounds for compromise must first be made "under" the regulations. *See* Treas. Reg. § 301.7122-1(a)(1); *see also id.* para. (c)(1) ("Once a basis for compromise under paragraph (b) of this section has been identified, the decision to accept or reject an offer to compromise, as well as the terms and conditions agreed to, is left to the discretion of the Secretary.").

## II.     *Doubt as to Collectibility Generally*

One of the grounds for compromise provided in the regulations is doubt as to collectibility. *Id.* para. (b)(2). "A determination of doubt as to collectibility will include a determination of ability to pay." *Id.* para. (c)(2). Accordingly, doubt as to collectibility "exists in any case where the taxpayer's assets and income are less than the full amount of the liability." *Id.* para. (b)(2); *see also* IRM 5.8.4.3.1 (Apr. 30, 2015) (defining the "components of collectibility . . . ordinarily . . . included in calculating the RCP" similarly). It is clear that "income," as used in the regulations, does not mean taxable income. That term is not used, and taxable income would not reflect the "ability to pay" that the regulations prescribe. *See* Treas. Reg. § 301.7122-1(c)(2); *see also* IRM 5.8.5.20(1) (Sept. 24, 2021) ("Future income is defined as an estimate of the taxpayer's ability to pay based on an analysis of gross income"). Consistent with that understanding of the regulations, the IRM provisions for computing a taxpayer's RCP—i.e., the taxpayer's "ability

---

[2] Citations herein are to provisions of the IRM as in effect during consideration of Mission's OIC by the IRS Independent Office of Appeals (Appeals).

to pay"—explicitly disregard rules applicable for determining taxable income. *See* IRM 5.8.5.26(3) (Sept. 24, 2021), 5.15.1.18(2) (Aug. 29, 2018) (providing that depreciation and other deductions for noncash expenditures are not taken into account in determining future income). And respondent does not argue, and the opinion of the Court does not hold, that Treasury Regulation § 301.7122-1(b)(2) refers to taxable income. Accordingly, section 280E, which applies for purposes of determining taxable income, *see* § 261, does not apply for purposes of determining income, and therefore does not apply for purposes of determining whether there is doubt as to collectibility, *see* Treas. Reg. § 301.7122-1(b)(2).

III.    *Special Computational Rule for RCP*

Despite the general rules in the regulations (and the IRM), the IRS adopted in the IRM a special computational rule for marijuana businesses. *See generally* IRM 5.8.5.25.2 (Sept. 24, 2021). The rule determines the future income—and thus RCP—of a marijuana business without taking into account expenses that are rendered nondeductible by section 280E. *See* IRM 5.8.5.25.2(1). However, the IRM also implicitly recognizes the fact that the special computational rule directly contradicts the regulatory provision that the RCP provisions in the IRM are meant to implement. *See* IRM 5.8.7.7.2(5) (June 23, 2022) (discussed *infra* Part IV).

IV.    *Rejection of Marijuana Business OICs*

The IRM does not provide for an OIC using the special computational rule to be rejected on the basis of ability to pay. Instead, it provides for such an OIC to be rejected on public policy grounds. *See* IRM 5.8.5.25.2(3). Specifically, it instructs: "If the taxpayer is unwilling to increase their offer to the value of the equity in assets plus a future income component calculated based on this subsection, the offer will be rejected under public policy." *Id.*

And the IRM includes provisions governing a "Public Policy Rejection" of an OIC. *See generally* IRM 5.8.7.7.2. Those provisions instruct:

> Do not summarily reject, under public policy provisions, an offer submitted by a taxpayer involved in the business of cultivating and selling marijuana. Prepare an RCP, per IRM 5.8.5.25.2, Calculation of Future Income - Cultivation and Sale of Marijuana in Accordance with State Laws. If

34

the taxpayer is unwilling to submit an acceptable offer based on the calculation involving allowable expenses for income tax purposes, rejection under public policy is appropriate. Rejecting under public policy further supports the determination, in the event the taxpayer argues the allowable expenses.

IRM 5.8.7.7.2(5). Thus, as respondent argues, a marijuana business must receive a little more consideration than any other type of business illegal under federal law might, in that its OIC is not to be "summarily" rejected. *Id.* It is, nevertheless, still to be rejected "under public policy" if the business refuses to pay the amount prescribed under the special computational rule. The explanation of the interaction of the "public policy provisions" with the special computational rule, coupled with the parallel reference to rejecting "under public policy," indicates that the edict that an OIC "be rejected under public policy" means that it be rejected under the "Public Policy Rejection" provisions.

Nevertheless, the opinion of the Court does not even mention, much less analyze, the public policy rejection provisions, which indicate that "[t]he rejection narrative should discuss the specific public policy issues." IRM 5.8.7.7.2(7). Those provisions state: "For CDP offers, Collection issues a predetermination letter versus a rejection letter. Because the standard language in the CDP Predetermination Letter does not include a public policy paragraph, it is necessary to edit the letter in Adobe PDF before sending to the taxpayer." IRM 5.8.7.7.2(4). And they further instruct:

Rejections of this type require the approval of the SB/SE Collection, Territory Managers (2nd level) in the field or SB/SE Compliance Services Operations Managers for COIC. Refer to IRM 1.2.2.6.1.2, Rejection Authority.

**Note:** If making this recommendation for a CDP offer under the jurisdiction of appeals, the approval of the second level manager must be shown in the file. They may sign the proposed determination letter, notate approval in the case history or remarks, or provide a printable e-mail.

IRM 5.8.7.7.2(8).

The "Rejection Authority" provisions referenced in the public policy rejection provisions generally authorize "Appeals Team Managers" (along with "SBSE Collection OIC Group Managers" and

"SBSE Collection Team Managers (COIC)") to reject OICs based on doubt as to collectibility. *See* IRM 1.2.2.6.1.2(1) and (2). However, consistent with the instructions of public policy rejection provisions concerning second-level-manager approval,[3] they do not authorize Appeals Team Managers to reject OICs for public policy reasons, instead authorizing approval within Appeals only by "Appeals Area Directors" (along with the "SBSE Collection Territory Managers" and "SBSE Collection Operations Managers (COIC)" referenced in the public policy rejection provisions). *See* IRM 1.2.2.6.1.2(4) and (5). There is no special provision concerning authority for rejection of OICs of marijuana businesses for public policy reasons.

V.    *Appeals Review of OICs*

Appeals, upon receiving a recommendation for rejection from Collection, is required to make a final determination following the "Appeals OIC Evaluation Procedures." *See* IRM 8.22.7.10.1.1(3). Those procedures state that Appeals must "research IRM 5.8 and related interim guidance to evaluate Collection actions, decisions and valuation methods for OICs." IRM 8.23.3.3(1) (Aug. 18, 2017). They also reference general provisions in IRM 8.23.3.1 (Aug. 18, 2017), which state:

> Appeals does not have its own set of rules or procedures for determining reasonable collection potential (RCP) in an OIC case. For this reason, this section largely does not reiterate what is already in IRM 5.8, Offers in Compromise. Rather, it discusses some of the more basic elements of the OIC evaluation process and provides guidance unique to Appeals' role in the OIC process.

---

[3] Those provisions clearly require Collection to obtain second-level-manager approval for a rejection on public policy grounds. *See* IRM 5.8.7.7.2(8) (first paragraph). Arguably less clear is the import of the note. It could be read to instruct Collection to also ensure second-level-manager approval for a recommendation to Appeals for a rejection. However, in the case of a collection due process OIC, Collection would simply issue the predetermination letter and send the recommendation to Appeals. *See* IRM 5.8.7.7.2(4), 8.22.7.10.4.5(1) (Aug. 26, 2020), 8.22.7.10.1.1(2)(b) (Aug. 26, 2020). Accordingly, it is not clear how a Collection second-level manager would be in a position to indicate approval by signing the proposed determination letter that Appeals is only tasked with drafting and approving after the recommendation has been made. An alternative reading of the note to provide instructions for Appeals approval of rejections is more consistent with the rejection authority provisions, which are, in any event, clearly applicable to Appeals.

They add: "When evaluating an appealed rejection, consult IRM 5.8 and any related interim guidance as a reference to ensure that Collection properly followed their procedures." IRM 8.23.3.1(5).

VI.    *Collection's Recommendation and Appeals' Determination*

A predetermination letter sent to Mission stated:

We have made a preliminary decision to reject your offer for the following reason(s):

Based upon the information you provided, we have determined that you have the ability to pay your liability in full within the time provided by law. Your special circumstances did not warrant a hardship.

In addition to preparing the Notices of Determination, Appeals prepared an Appeals Transmittal and Case Memo that simply stated, consistent with the predetermination letter: "The taxpayer's offer in compromise is rejected – the taxpayer can full pay the outstanding liability based on income and assets." Appeals apparently did not note the failure of the predetermination letter to "discuss the specific public policy issues," *see* IRM 5.8.7.7.2(7), and in fact followed Collection's lead in that regard. Given that, it strains credulity to believe that Appeals followed the IRM's instructions to research its OIC provisions—which the instructions make clear are relevant to Appeals—and "evaluate Collection actions," *see* IRM 8.23.3.3(1), to "ensure that Collection properly followed their procedures," IRM 8.23.3.1(5).

Moreover, the administrative record reveals involvement with Mission's OIC by process examiners, offer specialists, revenue officers, offer examiner supervisors, settlement officers, Appeals officers, and Appeals team managers, but it is not clear that a "second level manager" in either Collection[4] or Appeals approved the rejection of Mission's OIC. It is entirely possible that a second-level manager, appreciating the significance of the litigation that would necessarily ensue from the rejection in this case, given Mission's promise of litigation, might have

---

[4] To the contrary, a routing sheet entitled "Offer in Compromise Rejection" enclosed with the materials concerning Collection's proposed rejection of Mission's OIC has lines for review and signature for a "Team Manager" and a "Dept. Manager"; however, consistent with the instruction thereon to "[m]ark N/A unless offer was submitted for Public Policy Reasons," "N/A" appears in the spot for initials on the "Dept. Manager" line.

given it further thought. Even if such a manager approved the rejection, more thought might at least have been given to ensuring that the record reflected more than a possible "veiled reference," *see* op. Ct. p. 12, to public policy. Given that, failure to follow the procedures and seek such a manager's approval would not have been a meaningless misstep.

Accordingly, even if the text of the Notices of Determination could be waved away as easily as the opinion of the Court would suggest—which, for the reasons Judge Landy explains, I do not think it can—I would conclude that Appeals' apparent failure to follow *all* of the relevant provisions of the IRM was an abuse of discretion.

VII. *IRM Override of Regulations*

However, even if, with Appeals actually following the IRM provisions, "the result on remand would be a fait accompli," *see* op. Ct. p. 12, I would still conclude that the adoption of the IRM special computational rule for future income was an abuse of discretion. The IRM is intended to provide "procedural guidance" and "instructions to staff that relate to the administration and operation of the IRS." IRM 1.11.2.2(1) and (2) (Aug. 12, 2021). Guidance of that nature is understandably not subject to notice and comment requirements, *see* 5 U.S.C. § 553(a)(2), (b)(A), and it receives considerably less scrutiny as a result. However, given its limited role, it should not, by its own terms, "contradict . . . any existing guidance." IRM 1.11.2.2(6).[5] Yet, that is exactly what the special computational rule for the future income of marijuana businesses does in overriding the regulations' prescription that doubt as to collectibility be determined on the basis of income and ability to pay.

VIII. *Conclusion*

Contrary to the suggestion of the opinion of the Court, this case does not present the question of whether Treasury would be authorized

---

[5] Even if an "agency's discretion is unfettered at the outset," as the opinion of the Court suggests that Treasury's discretion may have been under section 7122, "if it announces and follows—by rule . . . —a general policy by which its exercise of discretion will be governed," as Treasury did in promulgating Treasury Regulation § 301.7122-1, "an irrational departure from that policy (as opposed to an avowed alteration of it)" may be an abuse of discretion. *See INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996). The IRS did undertake an "irrational departure" from the rules established by Treasury for determining doubt as to collectibility, and, although the IRS did purport to affirmatively alter the rules to do so, it could not, through the IRM, alter the regulations promulgated by Treasury. *See* Holmes dissenting op. p. 47.

under section 7122 to promulgate rules treating marijuana businesses differently from other businesses in determining whether there was doubt as to collectibility. It chose not to do that in promulgating the regulations and has not changed those regulations. Neither does it end with an answer to the question of whether Treasury may exercise its discretion under section 7122 to reject the OICs of some or all marijuana businesses on public policy grounds. Appeals did not follow the procedures for doing so. The question before the Court is whether there are abuses of discretion in Appeals' actions in this case and in the IRS's choice, in the IRM, to override regulations duly promulgated by Treasury. I would hold that there are.

HOLMES, *J.*, with whom LANDY, *J.*, joins, dissenting:

*"We're all textualists now."*[1]

*"What do you mean . . . 'we,' kemosabe?"*[2]

Our Court was recently reminded that "statutes trump regulations."[3] We should remind ourselves that regulations trump internal agency policy manuals.[4] Yet in today's opinion the Court neglects to apply the regulations that should govern these cases and instead reviews the reasonableness of the Internal Revenue Manual (IRM) provisions that the Commissioner seems to have applied. It upholds their reasonableness because it agrees with the Commissioner's understanding of the public policy underlying the enactment of section 280E, *see* op. Ct. pp. 11–12—a section of the Code that defines *taxable* income, not *available* income.

Can such a purposive analysis survive in this textualist age?

## I.

Mission's gross receipts grew from less than $2 million in 2016 to more than $16 million in 2021. High sales bring tax trouble to marijuana sellers. IRC section 280E bars any business that consists of trafficking in controlled substances from taking trade or business deductions. Enacted in 1982, this section was Congress's response to our decision in *Edmondson v. Commissioner*, 42 T.C.M. (CCH) 1533 (1981), *superseded by statute*, § 280E, where we allowed a cocaine dealer to deduct the ordinary and necessary expenses of his illicit trade. *See* S. Rep. No. 97-494, at 309 (1982), *reprinted in* 1982 U.S.C.C.A.N. 781, 1050. Federal law still labels marijuana a Schedule I controlled substance. *See* Comprehensive Drug Abuse Prevention and Control Act

---

[1] Harvard Law School, *The 2015 Scalia Lecture | A Dialogue with Justice Elena Kagan on the Reading of Statutes*, YouTube, at 8:29 (Nov. 25, 2015), https://www.youtube.com/watch?v=dpEtszFT0Tg.

[2] *See TV Scenes We'd Like to See*, Mad Mag., Mar. 1958, at 41, 42 (Tonto responding to the Lone Ranger).

[3] *3M Co. & Subs. v. Commissioner*, 154 F.4th 574, 576 (8th Cir. 2025), *rev'g and remanding* 160 T.C. 50 (2023).

[4] *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004) ("[N]either an unreasoned statement in the manual nor allegedly longstanding agency practice can trump a formal regulation . . . .").

of 1970, Pub. L. No. 91-513, § 202, 84 Stat. 1236, 1249 (codified as amended at 21 U.S.C. § 812).

Many marijuana businesses have tried to argue their way out of section 280E, but all have been unsuccessful. *See Patients Mut. Assistance Collective Corp. v. Commissioner*, 151 T.C. 176 (2018) (reiterating applicability of section 280E to state-legal drug sellers), *aff'd*, 995 F.3d 671 (9th Cir. 2021); *see also Olive v. Commissioner*, 139 T.C. 19, 42 (2012), *aff'd*, 792 F.3d 1146 (9th Cir. 2015); *Canna Care, Inc. v. Commissioner*, 110 T.C.M. (CCH) 408, 410 (2015), *aff'd*, 694 F. App'x 570 (9th Cir. 2017).

For the first several years that Mission was in business, this meant its tax troubles became chronic. It could subtract from its gross receipts the cost of goods sold, but the Commissioner disallowed millions in other expenses under section 280E. Mission couldn't pay and submitted an offer to compromise its debts for all the years from 2016 through 2021 for $65,000.

Like any offer that is submitted to the Commissioner, it was initially processed by the Centralized Offer in Compromise Unit (COIC). *See* IRM 5.8.2.1.6 (Sept. 22, 2020). While this OIC was still before COIC, the Commissioner sent Mission three notices of his intent to levy—one each for the taxes owed for 2016–19, 2019–20, and 2021. We dispose of the 2021 tax year in the memorandum opinion we issue today. *Mission Organic Ctr., Inc. v. Commissioner*, T.C. Memo. 2025-130. This dissent is about all the other years.

For those remaining years, Mission had a CDP hearing in January 2023 after COIC rejected its offer. The settlement officer issued two notices of determination. In both he concurred with COIC's reasoning that, in calculating Mission's "reasonable collection potential" (RCP), Mission's expected future income was to be its taxable income, not its available income. To quote from the key text in both notices, which is identical—"The revenue officer did not allow all other operating expenses per Section 280e [sic] – you are involved in cannabis business, which is considered an illegal business activity for federal purposes."

Note that this reasoning depends entirely on the Code. Nowhere does one find any citation to the regulations that govern the IRS's evaluation of OICs or to the IRM. These are determinations based on a policy inferred from the Code.

Mission expressed its intent to challenge that policy in our Court, as the notices of determination show:

> [Y]our Offer cannot be accepted as you can full pay the outstanding tax liability within the CSED[5] on an installment agreement. *Your POA did not want to discuss the compliance findings on your ability to pay stating he wants to go to U.S. Tax court on this issue.*

(Emphasis added.)

It is perfectly clear from the record for those other years that Mission wanted these to be test cases. It did not check the box stating that it wanted to challenge its underlying tax liabilities when it asked for this hearing. It did check the boxes stating that it couldn't pay because of financial hardship and that it would like a collection alternative.

## II.

Mission, in other words, accepts that any battle about section 280E has to be waged in Congress and not the courts. It is making a different argument: that the Commissioner should apply section 280E only to calculations of income tax owed and not use it to evaluate offers to compromise the very high tax bills that businesses like Mission end up with. This isn't a fight, argues Mission, about section 280E, but about the Commissioner's power to settle any tax bill under section 7122 and its underlying Treasury regulations.

The Commissioner doesn't bother to defend the actual reasoning in the notices of determination but instead bluntly defends these notices on the ground that COIC and the settlement officer were just following the IRM. *See* IRM 5.8.5.25.2 (Sept. 24, 2021).

Mission argues that the Commissioner committed an error of law, and thus abused his discretion, when he failed to consider its operating expenses in computing its income and then its ability to pay. It admits that the Commissioner's determination was dictated by IRM 5.8.5.25.2. But it argues that the IRM contradicts the Code and regulations, which speak of "income", not "taxable income", for the purpose of considering an OIC. The Commissioner argues in response that marijuana is still illegal under federal law, and that as a matter of public policy he is

---

[5] Collection Statute Expiration Date.

allowed to discern the intent of section 280E and apply that intent—rather than the text—when he computes income under the IRM.

Begin with the text of the section of the IRM that the parties argue about:

5.8.5.25.2 (09-24-2021)

Calculation of Future Income – Cultivation and Sale of Marijuana in Accordance with State Laws (09-24-2021)

(1) The value of future income used in the determination of an acceptable offer amount is calculated in a different manner when a taxpayer is involved in the cultivation and sale of marijuana, in accordance with applicable state laws. The method of calculating future income will be based on the following guidance:

. . . .

 b. Limit allowable expenses consistent with Internal Revenue Code 280E, where a taxpayer may not deduct any amount for a trade or business where the trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances . . . .

Is there, or is there not, a conflict between this part of the IRM and the sections of the Code and regulations that empower the Commissioner to compromise tax bills because of doubts as to their collectability?

A.

Look at the Code. Section 7122(a) gives the Secretary authority to compromise any civil or criminal case arising under the internal revenue laws. He's delegated that power to the Commissioner, and one of the factors the Code requires the Commissioner to consider is an individual taxpayer's basic living expenses under section 7122(d)(2)(A). The Commissioner reasonably includes items necessary for an individual's health and wellness—food, clothing, housekeeping supplies,

and personal-care items.[6]  The Code tells the Commissioner to include these expenses in calculating a taxpayer's RCP to ensure he can support himself while paying his tax liability.  *See* § 7122(d)(2)(A).  Mission makes a good point that these kinds of basic living expenses—rent, food, clothing, and the like—are typically nondeductible.  *See* § 262; Treas. Reg. § 1.262-1.  Mission likewise argues that its own corporate ordinary and necessary expenses are likewise nondeductible, and it asks the good question of how the Commissioner can construe "income" to mean only "taxable income" when computing a taxpayer's RCP.

This is a strong argument.

Mission also points to the regulations, and its argument becomes still danker.  What do those regulations say about nondeductible expenses?  I think the answer is that they tell the Commissioner to focus on a taxpayer's ability to pay, not his taxable income.  After all, each year taxpayers report their taxable income without considering their ability to pay.  But when a taxpayer applies for collection alternatives (like an OIC), his eligibility depends precisely on his ability to pay.

Treasury Regulation § 301.7122-1(b) dictates the grounds for accepting a compromise.  For offers made because there's doubt as to collectability, the regulation promises that the Commissioner is likely to accept in circumstances where a "taxpayer's assets and income are less than the full amount of the liability."  *Id.* subpara. (2).  In the worksheets attached to Mission's determination, he refers to calculating "income" as "total future income."  The Commissioner could have easily used, in both regulations and worksheets, the term "taxable income."  The regulations instead stress that in every consideration of an OIC for doubt as to collectability, the Commissioner's determination "will include a determination of *ability to pay*."  *Id.* para. (c)(2)(i) (emphasis added).  I agree with Mission that the use of "income" instead of "taxable income" in the regulation signals that the purpose of this calculation is to determine a taxpayer's ability to pay.

Because the regulation tells the Commissioner to determine a taxpayer's ability to pay, I would have held that the Commissioner needs to include nondeductible expenses in computing the income portion of his RCP computation.  His refusal to include them in his computation of Mission's RCP is even harder to explain when one considers that the

---

[6] *2025 Allowable Living Expenses National Standards*, IRS (Apr. 21, 2025), https://www.irs.gov/pub/irs-sbse/national-standards.pdf.

Commissioner volunteered in his brief that this refusal is limited to his evaluation of one collection alternative: OICs. When a marijuana seller applies for an installment agreement—a form of settlement in which a tax liability is paid or partially paid over time—the Commissioner admitted that he considers nondeductible expenses, even those excluded under section 280E, in calculating his ability to pay. Respondent's Answering Brief at 74. The Commissioner's only argument for this incongruity is that installment agreements, unlike OICs, have safeguards to protect the agency in the form of biannual reviews to check if a taxpayer's finances have changed. But I can't see how this distinction makes a textual difference in deciding whether a taxpayer's "available" income should include nondeductible expenses.

I therefore dissent, because today we neither apply nor even mention this regulation—a regulation that echoes the Code and refers to collectability that is doubtful because of a taxpayer's *available*, not *taxable*, income.

### B.

There are problems with this approach. The most obvious is that none of the determinations that IRS Appeals made regarding tax years 2016–21 relied on public-policy grounds to reject Mission's offers. *Chenery* tells us to rely on the reasoning used by the agency when it made its determination, not by the agency's lawyers in defending it.[7]

This should be enough to rule in Mission's favor, but the Commissioner makes a number of other arguments, mostly on the basis of public policy.[8] The Commissioner is correct that there is a public policy (at least at the federal level) against selling marijuana. He surmises that there is at least a small bud of an important distinction here—there is certainly no public policy against paying personal expenses, but there is against running a marijuana dispensary. He also

---

[7] *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). Judge Landy provides a robust discussion of the *Chenery* concerns with these cases, and I will not rehash them here. *See* Landy dissenting op. pp. 25–27.

[8] Policy judgments are not generally what we rely on for deciphering congressional intent. We instead pay attention to the text of the Code to affirm or reverse the Commissioner's determination. *See Fort Ord Toxics Project, Inc. v. Calif. EPA*, 189 F.3d 828, 834 (9th Cir. 1999) ("But we are not concerned with the wisdom of Congress' policy choice, and we lack the luxury to entertain the subjective intentions of various legislators. Our job is to effectuate Congressional intent as expressed in the statutory text").

makes the point that settlement officers have broad discretion in deciding whether to accept an offer. A settlement officer can reject offers not in the government's "best interest," even if a taxpayer does not have the ability to pay. *See* Rev. Proc. 2003-71, § 6.03, 2003-2 C.B. 517, 519. Other IRM provisions suggest that when a business's activity is criminal, its OIC can be rejected on public-policy grounds. *See* IRM 5.8.7.7.2(5) (June 23, 2022) (presenting circumstances where "[c]riminal activity is continuing" as appropriate for a public-policy rejection). And according to current federal law, Mission's business is one big criminal activity.

I also note, however, that IRM 5.8.5.25.2(3) tells Appeals officers to reject every OIC from a marijuana seller on public-policy grounds if it refuses to increase its offer after calculation of the RCP. This is not the exercise of discretion; this is a rule. And it's also a rule that looks incongruous when the section of the IRM that generally governs rejections of OICs on public-policy grounds reminds Appeals officers that "[a] decision to reject an offer for public policy reason(s) should be based on the fact that public reaction to the acceptance of the offer could be so negative as to diminish future voluntary compliance by the general public. *Decisions to reject offers for this reason should be rare.*" IRM 5.8.7.7.2(2).

The Commissioner wins today because the opinion of the Court okays his use of IRM guidelines to calculate Mission's RCP as consistent with the "public policy" underlying section 280E. The Commissioner also raised a host of other public-policy arguments left unmade by the settlement officer and not relied on by our Court today. In the interest of completeness in a case headed for appeal, I will analyze them.

His first public-policy argument is the treatment of dissipated assets in *Johnson v. Commissioner*, 136 T.C. 475 (2011), *aff'd*, 502 F. App'x 1 (D.C. Cir. 2013). In *Johnson*, Appeals relied on the IRM to include the value of dissipated assets, or assets that have already been sold, in calculating an RCP. In deciding this issue, *how* the income was spent matters. IRM 5.8.5.5 (Sept. 23, 2008) suggests taxpayers who sell assets knowing they have tax liabilities, and then spend the proceeds frivolously, are subject to an inflated RCP. *See Johnson*, 136 T.C. at 487 ("If the investigation clearly reveals that assets have been dissipated with a disregard of the outstanding tax liability, consider including the value in the RCP calculation." (quoting IRM 5.8.5.5(5))). Updates to this IRM provision go a step further, penalizing taxpayers who purposely sell

their assets to avoid paying their tax debts.  IRM 5.8.5.18(1) (Sept. 24, 2021).

I would not read *Johnson* to allow an inflated RCP here.  The dissipated-asset cases are really about tax avoidance by those who already know they have a big unpaid tax bill.  That's not Mission's situation.  It didn't dissipate assets—Mission didn't actively spend its revenue in an effort to avoid paying its tax.  Just like any taxpayer in a legal or illegal business, Mission needed to spend money to make money.  The gross revenue that the Commissioner is trying to include in Mission's available income wasn't available to it in the same way a spendthrift taxpayer's assets are.

The Commissioner is also correct that there are other cases where we've upheld his rejections of public-policy grounds.  In *Speltz v. Commissioner*, 124 T.C. 165 (2005), *aff'd*, 454 F.3d 782 (8th Cir. 2006), the taxpayers submitted an OIC based on doubt as to collectability but argued for its acceptance on public-policy grounds.  They wanted to be placed in a wholly different category of OICs—those made for "effective tax administration" (ETA)—where "collection in full would undermine public confidence that the tax laws are being administered in a fair and equitable manner."  IRM 5.8.11.2.2(1) (May 15, 2004).  But this works only when an offer is coupled with exceptional circumstances.  *See* Treas. Reg. § 301.7122-1(b)(3)(ii); *see, e.g.*, *Brown v. Commissioner*, T.C. Memo. 2025-17, at *13 (finding an Appeals officer didn't abuse her discretion by rejecting an ETA-offer on the grounds that the taxpayers' OIC wouldn't have community impact); *Gillette v. Commissioner*, 116 T.C.M. (CCH) 511, 516–17 (2018) (Commissioner did not abuse his discretion in rejecting taxpayers' public-policy OIC when there wasn't a compelling reason to treat them differently from other taxpayers in the same situation), *aff'd*, 801 F. App'x 398 (7th Cir. 2020).

There were no exceptional circumstances in *Speltz*, just taxpayers who argued that the Code imposed an "impossible-to-pay" tax rate.  *Speltz*, 124 T.C. at 175.  Mission's argument is different—it challenges neither the Code nor the regulations but only the IRS's own subregulatory guidance.

I conclude from this that the Appeals officer correctly applied the IRM but abused his discretion in doing so because, on this point, the IRM contradicts both the regulation and the Code.  That alone should have let us weed out this argument and remand these cases.

47

III.

A.

The opinion of the Court today reasons from a process quite different from the usual analysis of the Code, then the regulations, and only then internal agency guidance. The problems begin with its rewriting of the notices of determination. Nowhere in those notices does the settlement officer even mention "public policy." He instead agrees with COIC's analysis that Mission's RCP can't include most of its expenses "per Section 280e." This is a construction of the Code, and even the opinion of the Court recognizes that section 280E must be read as a constraint on calculating taxable income, not on calculating RCP. "[R]ejecting the offer-in-compromise solely on the basis of an understanding that section 280E required that result would have been an error." *See* op. Ct. pp. 9–10.

It then effectively rewrites the operative text in the notices to say that the settlement officer was relying on the IRM, and the IRM is reasonable, not because ignoring disallowed section 280E expenses is required by the Code but because the policy is "consistent with Internal Revenue Code 280E." *See* op. Ct. p. 11 (quoting IRM 5.8.5.25.2(1)(b)). It reasons that, because "[s]ection 280E and its legislative history express a congressional intent to disallow deductions attributable to a trade or business of trafficking in controlled substances," *see* op. Ct. p. 12, it is no abuse of discretion for the Commissioner to extend that disallowance to the calculation of Mission's RCP.

The key problem here is that there is a regulation that states "[a] determination of doubt as to collectability will include a determination of ability to pay." Treas. Reg. § 301.7122-1(c)(2). That simply wasn't done here. And because it wasn't done here, the opinion of the Court trips over a basic principle of administrative law: an agency's internal guidance or interpretive rules cannot overcome its own regulation. The Supreme Court held this about the IRM itself: "But neither an unreasoned statement in the manual nor allegedly longstanding agency practice can trump a formal regulation with the procedural history necessary to take on the force of law." *Cent. Laborers' Pension Fund*, 541 U.S. at 748.

The Ninth Circuit itself has stated the IRM "does not have the force of law and does not confer rights on taxpayers." *Fargo v. Commissioner*, 447 F.3d 706, 713 (9th Cir. 2006), *aff'g* T.C. Memo.

2004-13. It has also held that internal agency guidelines that are not sent through notice-and-comment rulemaking are mere "interpretive" rules, and do not "have the force of law." *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004). When the opinion of the Court acknowledges that the text of the Code in section 280E is inadequate support for the Commissioner's calculation of Mission's RCP, it necessarily is relying on the IRM to justify his denial of Mission's OIC. This means that it is treating the rule created by the Commissioner in the IRM as a legislative rule, because the IRS is using it to effect a change in existing law. *See Erringer*, 371 F.3d at 629. And, as Judge Jenkins explains in her dissent, legislative rules that are not tested by notice and comment are not enforceable. *See* Jenkins dissenting op. p. 37; *see also Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1084 (9th Cir. 2003).[9]

## B.

I would have favored a narrow ruling in Mission's favor based on the administrative records in these particular cases. One should be cautious to not read section 280E out of the Code by encouraging state-legal marijuana businesses to assume that they can roll up their nondeductible expenses into every request for an OIC—marijuana businesses should not expect to successfully staple OICs to their tax returns every year. The reason for this is that the process for compromising a tax liability has exceptions for taxpayers that abuse it. Before an Appeals officer can even look at a taxpayer's financial information, he must verify whether its federal tax deposits are current, its estimated tax payments are made, and its returns are filed. *See* IRM 5.8.4.6 (Apr. 25, 2025). The Secretary can disregard any request for collection alternatives that "reflects a desire to delay or impede the administration of Federal tax laws," § 6702(a)(2)(B), (b)(2)(A)(ii), and deny further administrative and judicial review, §§ 6702(b)(2)(B)(ii)(II), 7122(g); *see also Thornberry v. Commissioner*, 136 T.C. 356, 362 (2011).

---

[9] *Hemp Industries Association*, 333 F.3d at 1088, stated that "when an agency does not hold out a rule as having the force of law, it may still be legislative if it is inconsistent with a prior rule having the force of law;" and, "if there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations. This makes it legislative." It further held that only legislative rules, not interpretive rules, "can amend a prior legislative rule." *Id.* Legislative rules require notice-and-comment procedures, and these procedures cannot be circumnavigated by labeling a legislative rule an "interpretive rule" while giving it the force of law. *See id.* at 1087.

An offer in compromise is not for those looking for an easy way out of ever paying their just tax debts, and it is not a one-size-fits-all solution; many marijuana businesses would be ineligible to apply because they are in good financial shape. And even those that have faced quite a financial predicament in the past must show compliance with the Code—even compliance with section 280E—in the present. But under the right circumstances OICs can allow the Commissioner to collect some portion of a tax debt faster than enforced collection that might drive a taxpayer out of business. *See* Policy Statement P-5-100, IRM 1.2.1.6.17 (Jan. 30, 1992).

We should have found those circumstances to exist here.

I respectfully dissent.